On behalf of the accountant, Mr. Michael T. Coppedge. On behalf of the athlete, Ms. Laura M. Wall. Thank you. Justice Zinoff is assigned to this panel. Unfortunately, there is a family problem that she is experiencing that has made it impossible for her to be here today. But she will be participating in the discussion on the resolution of the decision of this case, and also she will listen to the oral arguments. Thank you. You may proceed, Mr. Coppedge. Your Honor, good morning. Ms. Wall, good morning. Michael Coppedge on behalf of the appellant. Preparatorily, Your Honor, suffering from a bowel allergy, so if I don't enunciate clearly to say so, no offense will be taken, and I'll do the best I can. We are asking the court to reverse the order of the trial court, granting summary judgment in favor of Belmonte Properties, and we are doing so based upon the fact that we believe the record contains either undisputed issues of material fact that favor Mr. Sedlacek, the plaintiff, or disputed issues that favor Mr. Coppedge. And it is our position, Your Honors, that when you apply the facts and the record to the core elements of the negligence cause of action, summary judgment should not have been granted. And specifically when we speak of the issue of duty, it is our position that the probative question becomes, was there evidence that Belmonte Properties knew that Brutus the Rottweiler was a danger to children or persons, members of the general public? The record is clear that Dean Belmonte knew that the dog was vicious and aggressive, very aggressive, and knew that some several weeks before the bite incident that affected Mr. Sedlacek took place. Mr. Belmonte, in fact, identified that he met with Janice Raymond, the grandmother on the property, on the day he was there in mid-April of 2011. And according to him, Janice Raymond indicated that she had a fear for her grandchildren, and she asked Mr. Belmonte to contact Karen Raymond, her daughter-in-law, for purposes of addressing the dog. Now, isn't there a big difference, though, if your client was on the premises as opposed to just walking by, minding his own business with his own dog? Doesn't that make a big difference? I don't know. I think it makes a difference, certainly, Your Honor, a big difference. I guess that's a matter of interpretation. What I think that does invite is the interplay between this Court's decision in Klitschko, which was an on-premises injury, and which this Court talked about how a duty can come to be, and the Solario assessment, which was evaluated by the trial court, which, as you know, was an off-premises injury, and the Court in Solario certainly was concerned about, took issue with the fact that the dog was a danger to children. If you're going to impose liability for the defendant, though, for your client who was not on the premises, where are you going to draw that line? If Brutus had just run out and run a mile away and attacked your client at the park a mile away, is there liability there? Probably not. I'm directly and candidly stating, Your Honor, but I believe that it might. Where does that liability begin? I think it's a fact-by-fact assessment, and I think that's exactly part of the argument that we advance to the trial court. In this instance, as the record substantiates, the public sidewalk on which Mr. Sedlicek was walking, and I think it's also depicted in the photograph as part of the record, was literally abutting the fence. I'll say three foot. Was it measured? No. Is there a distance containing the record? No. But visually, you can see it in the photograph. I would answer Your Honor's question by saying the proximity of that sidewalk, in conjunction with the rest of the facts that existed in terms of how this injury took place, and what the Belmontes knew or are alleged to have known in terms of Mr. Belmonte's admissions, suggests that there is a duty and associated liability. So does a passerby third party have a right to rely on the owner, in this case the landlord, to have a good gate, a gate in good repair? Is there a duty there? Yes, to answer that question, and I think that's a fallback to the assessment in Clixton, which again I acknowledge was an on-premises injury, but the focus that led to the determination of whether or not a duty existed in that case was either did the landlord control the property, and we argue that here Belmonte did, or was one of the articulated exceptions triggered, and we argue that one of the exceptions was triggered here, and we would argue that based upon the facts, the proximity of where Mr. Sedlacic was when the injury occurred, that yes, there was a duty. Counsel, you state on page 15 of the white brief, your brief, in this case the broken gate was admittedly a condition and not the cause of the plaintiff's injury. Brutus, the rottweiler, was the cause of the injury. If you concede that the broken gate was not the cause of the plaintiff's injury, how can the landlord's conduct have been a proximate cause of the injury? In my answer to that, Your Honor, segueing into the proximate cause discussion, I believe that the facts as we have them in totality put us in line with this Court's decision as issued in Summons in terms of the intoxicated gentleman leaving the gentleman's club, driving down the road, causing a very serious accident. My analogy is the same here. The trial court turned its decision on summary judgment on proximate causation and cause versus condition. Are there any facts in the record to suggest that the landlord should have known that the tenants would fail to comply with the order to immediately remove the dog from the premises? No. I readily say no. The fact of the matter is it was addressed by the trial court, and the trial court said a demand was made, a second demand was made on the same day, and the trial court construed that demand to remove the dog as taking action as opposed to taking no action. I suppose, by extension, we certainly can read the record and read the testimony of Mr. Belmonte and Mrs. Belmonte, suggesting that these were difficult tenants, parties with whom they had problems in terms of repair on other outbuildings of the property, damage that was caused by the range of children, which I believe was a garage, suggesting they may have had concern about whether this tenant would accede to the demand to remove the dog. By a direct statement, Judge, Your Honor, no. Our Supreme Court in Marshall v. Burger King said as one of the factors, the reasonable foreseeability of the injury, if there is nothing to suggest that the landlord should have known that the tenant would fail to comply with the order to immediately remove the dog, how could this be reasonably foreseeable that the dog would actually be a danger and would require some sort of restraint other than the gate being defective? Well, I think, as I heard that recital, Your Honor, that's a myriad of factual issues, and in this case, I believe we have Mr. Belmonte saying that when he was there in mid-April, he thought this dog was going to literally, I believe was his description, come through the glass, not in a figurative sense, but he literally thought that. And he characterized the dog as aggressive and very vicious, such that he was not even willing to go in the door. He called Janice Raymond and asked her to come meet him outside. Was there any factual dispute as to who was in control of the premises insofar as what the lease said with whether or not the tenant or the landlord was responsible for repairs on the property during the tenancy? I don't think there was any dispute relative to the lease, Your Honor, but I believe that there is a dispute as to what transpired in regard to commitments to make repairs by the landlord. As the record reflects, and as Your Honors know, Josh Raymond testified that there were at least 13 conversations about repairing the gate, one of which took place at lease inception in 2008, and Mr. Raymond said that it was explicitly promised to them, to the Raymond family, that Belmonte Properties would repair the gate, and that the follow-up conversations over the next two or two and a half years were all in that context, and none of that activity took place. And so I think you have a dichotomy there between what perhaps is the lease language and what was promised by Belmonte Properties at the inception of the lease. Your Honor, just a point of clarification, I didn't look at the record, but in your brief you actually make the statement on page 5 that beginning in 2012, the lower left-hand side of the gate was completely broken off. Is that what you meant to say, beginning in 2012? Or is that at some earlier point in time that's more relative to this May 2, 2011 date? I appreciate the observation, Your Honor, and I believe that probably is a mistake pertinent to the date. I believe I probably should have typed beginning 2011. Is that what that – okay. And what I would say, in fairness to the Court in the question, if I review the record at that site and location, that's what Mr. Raymond said. That's an extra from Mr. Raymond's testimony. If he said beginning in 2012, whether he was correct or not in his deposition, I can't – I won't say that. But certainly beginning in 2011, the lower left-hand side of the gate, according to Mr. Raymond, was broken off, and certainly there's a dispute about that from the Belmontes. Okay. Thank you. It is, as I was articulating, our position very simply that there was and is a duty that befalls Belmonte properties. It is our position that proximate causation exists both in terms of legal causation and cause and fact, and it is the Covenant's position that you reach that point by a totality of the fact assessment as opposed to a black-line standard that exists. And I think that started our discussion, Justice Spence, in terms of how do you know? And my response to that is that when you try to draw an absolute standard here, you are creating possibilities and potentially excluding scenarios where there should be liability but for an established black-line standard. And it's our position very simply that you have to look at the case based upon the facts as you have them, and in its totality here, we believe that summary judgment was inappropriate. I'm happy to answer any questions. I don't want to belabor. You read my briefs, obviously, and I appreciate that. Who put the bungee cord on the gate? Say that one more time, please.  Josh Raymond is the party who, I believe, the record establishes corded the gate. I don't believe I have any other questions. Thank you so much for your time. I appreciate it. You'll have an opportunity to make rebuttal. Yes, sir. Good morning, Your Honors. May it please the Court, Counsel. My name is Laura Ball. I'm here on behalf of the defendant, Abilene Balmonte Properties, LLC. Obviously, Your Honors, it is our position that the lower courts correctly granted our summary judgment in this case. It appears from reviewing what is minimal case law in the state of Illinois, the Klitschko case, which the Sinopo Court ruled on, and the Solario case, which is a First District case, that our set of facts are sort of a combination of those two cases. This is a situation where the defendants were not aware that this dog was on the property until mid-April when Mr. Balmonte went to collect some rent. He did feel that the dog was vicious, that it was barking, growling, jumping at the window, and immediately told Mr. Raymond to have that dog removed from the property. Went home, told his wife, told his wife, his wife called and said, remove it. There's absolutely no reason for them to believe it won't have been removed. This is not a family pet. This is a dog they were watching. This is a phone call. Did the landlord even have authority to tell them to get rid of the dog? Well, I believe that they may have in light of the pet policy that was attached to the lease, which gave them specific permission to have their own dog, and they did have a dog on the property. Although I don't know if that really matters. I think this honorable court actually said regardless of whether or not they had the authority to ask them to remove the dog and even threaten to end their tenancy, that that wasn't sufficient. When they were talking about control of the property, that wasn't sufficient control over the property. If you look in Solorio where we're talking about facts, very, very similar. This is a case where there's evidence that the landlord had even told the tenant to get rid of the dog because it was chewing up the basement. There was, and the court said, and I wanted to quote it because I actually thought that it was right on point to our arguments. The lower court had found that it did not believe there was a reason the owner would anticipate that a broken gate would lead to an injury. The plaintiff then argued he should have known the dog was dangerous because it tore up the basement. And the court said, well, chewing up the basement's not the same thing as escaping and chewing up a neighbor. That's exactly what we have here. My client never saw the dog in the backyard, saw it inside, never even saw property damage, chewing up the basement or anything. He thinks it's a scary dog, yeah. I will admit that, and he said that very clearly in his deposition. And he asked them to remove the dog because probably more for property reasons. I think he testified he was clawing at the windows and the screens inside of the house. So when you look at the set of facts that were in Solorio and what we have here, extremely similar. Obviously Solorio looked to the Klitzkuh decision because that was probably the first case in the state of Illinois that discussed the issue of a landlord's duty, if any, as it relates to a tenant's dog. Did you, by any chance, do any research relative to Burger King v. Marshall or Marshall v. Burger King? I did not, Your Honor. I wrote that down, but I had not looked at that prior to this. Other than that, Your Honors, I'm relying, obviously, on my brief, the case law that we've cited, and the arguments that we've made today. I respectfully would ask this court, if you don't have any more questions, to affirm the lower court's decision granting our summary judgment. Thank you. Thank you. Mr. Coppedge. Your Honor, thank you. Two quick points in response to my colleague's arguments. One in response to your question, Justice. Yes, there is authority to ask for the removal of the dog. Although we don't argue in our brief, the pet policy is part of the record. The pet policy contains express language that vicious and aggressive dogs are not allowed on the property. And so under the express terms of the pet policy, Belmonte Properties had the authority to ask for the removal or demand the removal of the dog. Secondly, in terms of my colleague's reliance upon Solorio in the suggestion that the facts are by and by identical, with which I disagree, but let me pose this question then. If it was not a concern to Belmonte Properties in terms of anticipated injury being caused by this dog, then why did it demand the immediate removal of Bruce? Belmonte Properties didn't say that dog needs to be gone, take care of this property as you can. Two different representatives of Belmonte Properties demanded the immediate removal. And in fact, when Karen Raymond was speaking to Mrs. Belmonte, she said, well, we'll get rid of it in a couple weeks, we're dog sitting. And Mrs. Belmonte said, that's not good enough. It needs to be immediately removed. The logical extension of why Belmonte's was demanding immediate removal is because they did in fact anticipate that this dog could be the cause of injury to people on or near the property. With those rebuttal comments, I again thank the court. Anything else, ma'am? Thank you. We'll take the case under advisement and a disposition rendered in a auspicious period of time as the court's adjourned for the day.